UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES RAINS,

          Plaintiff,

                                      Case No. 11-cv-12509

v.

                                      Paul D. Borman
                                      United States District Judge

TOWNSHIP OF UNADILLA,
RYAN HAMLIN, GARRY FLANARY,
K. KOPACZ, TOWNSHIP OF
NORTHFIELD, and DAVID POWELL,

          Defendants.

_____/

## OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. No. 23)

This is a civil rights case arising under 42 U.S.C. § 1983. James Rains ("Plaintiff") filed the Complaint in this matter on June 9, 2011. (Dkt. No. 1.) The Defendants are Unadilla Township ("Unadilla") and Unadilla Police Officers Kevin Kopacz, Ryan Hamlin, and Garry Flanary, as well as Northfield Township ("Northfield") and Northfield Police Officer David Powell (collectively "Defendants").

On July 23, 2012, Defendants filed a motion for summary judgment. (Dkt. No. 23.) Plaintiff filed a response on September 4, 2012. (Dkt. No. 28.) Defendants filed a reply on September 11, 2012. (Dkt. No. 29.) The Court held a hearing on April 25, 2013.

For the reasons stated below, the Court will GRANT Defendants' motion for summary judgment.

## I. BACKGROUND

1

## A. Pre-Arrest Investigation

In March and April 2009, Danny Glover began receiving threatening telephone calls. The calls were vulgar and threatening towards Mr. Glover and his family. The caller, who had a male voice with an American southern accent, stated that he knew where Mr. Glover lived, that he was going to kill Mr. Glover, and that he was going to rape Mr. Glover's wife and daughters. Mr. Glover's daughter, Roselynn Wehr, also began receiving similarly threatening calls on her cell phone.

On April 14, 2009, Mr. Glover and Ms. Wehr walked into the Unadilla Township Police Department and reported the threatening calls. Mr. Glover spoke with Defendant Hamlin, and described the caller's voice as having "a deep southern voice." (Defs.' Mot. for Summ. J., Ex. 1, Police Report at 2.) Ms. Wehr spoke with Defendant Kopacz. During the interview, Ms. Wehr received another threatening call from the individual, and handed her phone to Defendant Kopacz. Defendant Kopacz spoke with the individual and told him to stop calling. Defendant Kopacz described the individual's voice as having "a southern accent and slurred speech." (Police Report at 3.)

Defendant Hamlin requested a search warrant for Mr. Glover and Ms. Wehr's cell phone records to identify the number of the threatening caller. On April 29, 2009, Defendant Hamlin received the records and observed that the phone number (734) 444-4961 appeared at all the times Mr. Glover and Ms. Wehr claimed that they had received the threatening calls. Defendant Hamlin then identified that the number was for a cell phone belonging to Plaintiff James Rains, and requested a search warrant for Plaintiff's phone number. Defendant Hamlin observed that, according to Plaintiff's phone records, calls were made to Mr. Glover and Ms. Wehr 14 times

2

between March 18, 2009, and April 14, 2009.  At his deposition, Defendant Hamlin conceded that, even though the cell phone belonged to Plaintiff, it did not mean that Plaintiff made the threatening calls.  (Defs.' Mot. for Summ. J., Ex. 3, Hamlin Dep. 16.)  Defendant Hamlin also admitted that he knew during the investigation that Plaintiff's son, Kevin Rains, also lived with him.

> Q.    But other than the phone number being attached to Mr. Rains and these calls, does that mean in and of itself that Mr. James Rains was making them calls?
> A.    No.
> Q.    Okay.  When you were doing the investigation, were you aware that anyone else lived with Mr. Rains?
> A.    Yes, Mr. Rains told me his 15-year-old son was the only person that resided with him.

(Hamlin Dep. 16.)

Defendant Hamlin called Plaintiff's cell phone on April 29, 2009.  Defendant Hamlin reported that "[w]hen [he] called the phone number a male with a deep, southern dialect sounding voice answered."  (Police Report 4.)  Defendant Kopacz assisted Defendant Hamlin with the phone interview of Plaintiff, and "identif[ied] James' voice as the same voice when [Defendant Kopacz] spoke with him on 4/14/09."  (Police Report 3.)

Plaintiff told Defendant Hamlin that the cell phone was his, and that he kept it on him at all times.  (Police Report 4.)[1]  Plaintiff admitted that he had called Mr. Glover, but said he called about getting a boat motor repaired, and that any other calls were probably misdials.  Plaintiff also admitted that he had been to Mr. Glover's house before and had spoken to Mr. Glover's son regarding a boat motor repair.  Plaintiff denied making any threatening calls to Mr. Glover: "when I called, it was all business.  I mean it was just strictly business."  (Defs.' Mot. for Summ. J., Ex. 6,

---

[1]Plaintiff's deposition does not conflict with the statements recorded in the Police Report. (Defs.' Mot. for Summ. J., Ex. 6, Pl. Dep. 51-56.)

Pl. Dep. 55.)  Defendant Hamlin asked Plaintiff if he would meet with him, and Plaintiff said he would.

On May 28, 2009, Defendant Hamlin called Plaintiff for a second time and left him a message asking if Plaintiff could come into the Unadilla Township Police Department for an interview.  Plaintiff called Defendant Hamlin back the same day and told him that his attorney advised him not to come in for an interview.

Defendant Hamlin completed a Request for Warrant to arrest Plaintiff on June 3, 2009.  The request was approved by the Livingston County Prosecutor on June 9, 2009, and signed by a magistrate judge on June 10, 2009.

**B.  June 12, 2009 Arrest**

In June 2009, Plaintiff and his son resided at 765 Six Mile Road in Northville Township, Michigan.  Defendant was 58 years old, and his son was 15 years old.

During a briefing at the beginning of his shift, Defendant Flanary was advised about the warrant for Plaintiff's arrest.  Defendant Flanary contacted Defendant Powell with the Northfield Township Police Department to check Plaintiff's residence. Defendant Flanary requested Defendant Powell's assistance with the residence check because it would have been "a 45-minute drive to get there and [Northfield is] right there."  (Defs.' Mot. for Summ. J., Ex. 9, Flanary Dep. 13.)

Defendant Powell checked the residence at approximately 9:38 p.m., but Plaintiff was not home.  At approximately 11:27 p.m., Defendant Powell re-checked Plaintiff's residence and determined that he was home.  Defendant Powell radioed for assistance from Unadilla Township officers.  Defendants Hamlin, Kopacz, and Flanary met with Defendant Powell near Plaintiff's residence and discussed executing the warrant.

4

Defendant Officers Powell and Kopacz were both wearing body microphones during the execution of the arrest warrant on June 12, 2009. These microphones recorded the audio of the events that transpired from the time the Defendants approached Plaintiff's home to the time Plaintiff arrived at the Livingston County Jail.

Defendants Flanary, Powell, and Kopacz initially approached the side door of Plaintiff's residence, but Plaintiff told his son to ask Defendants to go to the front door of the home. Plaintiff answered the door in bare feet and stepped onto the front porch. He spoke with Defendants briefly, then stepped back inside to put his shoes on. Defendants then entered the house with Plaintiff.

Defendants asked Plaintiff to put his hands behind his back, and Defendant Kopacz handcuffed Plaintiff. Defendants asked Plaintiff if he was a convicted felon, which Plaintiff confirmed,[2] and asked if they could look around the home.

After Plaintiff was handcuffed, Plaintiff's son, Kevin, admitted that he had made the threatening calls. Defendant Kopacz and Defendant Flanary took Plaintiff outside and placed him into a police vehicle, while Defendant Hamlin spoke to Kevin Rains about the phone calls. After Defendant Kopacz returned to the house, Kevin Rains explained to Defendants Hamlin and Kopacz how he made the threatening phone calls by using an online "soundboard." One of the voices available on the online soundboard that Kevin Rains used had a southern accent. Defendants asked Kevin Rains to write out a statement regarding the threatening calls, which he did.

Defendant Kopacz took Plaintiff to the Livingston County Jail. On the way to the jail, Defendant Kopacz pulled the car over and used his cell phone for approximately 20 minutes.

---

[2]Plaintiff was convicted by a jury of assault and battery in 1991 after he "threw [a man] through [his] door[.]" (Pl. Dep. 76-77.)

5

A video of the booking room at the Livingston County Jail shows Plaintiff entering the booking room at approximately 1:19 a.m. (Defs.' Mot. for Summ. J., Ex. 12, Intake Video at 00:13.) After Defendant Kopacz removes the handcuffs, Plaintiff shows him his wrist and says, "That got my wrist pretty good, didn't it?" (Intake Video 05:35.) When Defendant Kopacz asks Plaintiff if he is injured or in need of medical assistance, Plaintiff answers, "No, I'm okay." (Intake Video 08:50.)

Plaintiff was released from jail on June 13, 2009. The charges against Plaintiff were dropped on July 24, 2009. The criminal charges were eventually pressed against Kevin Rains, who pled guilty and was sentenced to six months probation.

## C.  Conflicts Between Plaintiff's Deposition and Audio Recordings

Several "facts" stated by Plaintiff at his deposition are contradicted by the audio recordings in this case.

Plaintiff testified that when he went inside to put his shoes on, Defendants "all ran in" and pushed him into his kitchen. (Pl. Dep. 59.)

> Q.   Did you step inside of the door?
> A.   No, I just leaned up on the door and put my foot in one shoe and started to put[] the other one on, and I got pushed all the way to my kitchen. Officer Kopacz, he pushed me in the kitchen, and Hamlin, Flanary, and David Powell come on in.
> Q.   Did they say anything before they, somebody pushed you?
> A.   No.
> Q.   Did the officer say, is it all right if I come in with you?
> A.   No, they didn't.

(Pl. Dep. 60.)

On Defendant Powell's audio recording, one of the Defendant officers can be heard asking Plaintiff, "Is it all right if I come in with you?" And Plaintiff responds, "Yeah." (Defs.' Mot. for

Summ. J., Ex. 12, Powell Recording 04:13.)

Plaintiff testified that he told Defendant Kopacz that the handcuffs were too tight immediately after he was handcuffed, and that he said it again while Defendant Kopacz was taking him to his car.

> Q.    Now, do you remember the officer saying to you to put your
>         hands behind your back?
> A.    Yes, I remember that.
> Q.    And did he cuff you right after he said that?
> A.    Yes, he did.
> Q.    And did you immediately complain[] right after he --
> A.    I said they're too tight.
> . . . .
> Q.    And you were in the house when you told him this?
> A.    The first time.
> Q.    The first time in the house?
> A.    Right.
> Q.    And the second time was where?
> A.    On the way to the car.

(Pl. Dep. 34-35.)

Plaintiff can be clearly heard on the recording from Defendant Powell while he is being handcuffed, but Plaintiff does not complain that the handcuffs are too tight. (Powell Recording 05:10.) On the recording from Defendant Kopacz, Plaintiff is again clearly audible, and never complains about the tightness of the handcuffs while Defendant Kopacz escorts him to the car. (Defs.' Mot. for Summ. J., Ex. 12, Kopacz Recording 02:30.)

Plaintiff testified that he asked Defendants if they had a search warrant before they searched his home, and that Defendants responded, "We'll look for what we want." (Pl. Dep. 61-62.)

On the recording from Defendant Powell, an officer asks Plaintiff, "If you don't mind, Northfield [Defendant Powell] and I are going to take a quick look in the house and make sure there are no weapons in the house, alright?" Plaintiff responds, "I have no weapons in the house."

7

(Powell Recording 07:25.)

Plaintiff testified that when he was getting into the police car, Defendant Kopacz "jammed [Plaintiff's] leg over [his] other leg."  (Pl. Dep. 21.)  Plaintiff claims that he was injured when Defendant Kopacz moved his leg.

> Q.    Did you cry out in pain?
> A.    Yeah, I said, man, that hurts.
> Q.    And if I had an audio recording of what happened in the car,
>        I would hear you say, man, that hurts?
> A.    You should.
> . . . .
> Q.    The truth is that when your leg moved over, you cried out in
>        pain and said what?
> A.    I said my leg is hurting.
> Q.    And what did the officer say?
> A.    He didn't say anything.

(Pl. Dep. 23-24.)

On the recording from Defendant Kopacz, a car door opening can be heard at 03:09. (Kopacz Recording 03:09.)  Defendant Kopacz then tells Plaintiff to "Have a seat."  (*Id*. at 03:13.) Defendant Kopacz tells Plaintiff to slide back and put his feet into the car, and Plaintiff responds, "I got a bad leg here."  (*Id*. at 03:34.)  Defendant Kopacz responds, "Just do the best you can with it."  (*Id*. at 03:38.)  Defendant Kopacz then says, "You got it?" and Plaintiff responds, "Yeah, I'm okay."  (*Id*. at 03:43.)  Plaintiff does not complain about any pain on the recording.

Plaintiff testified that he was in the police car for two hours, and that Defendants searched his home for over an hour. (Pl. Dep. 26-27.) Defendant Kopacz's recording shows that Plaintiff was in the police car for approximately one hour and seven minutes.  (Kopacz Recording 00:04:00-01:10:47.)

8

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when there are disputes over facts that might affect the outcome of the suit." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (internal quotation marks omitted).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008).  The Court does not weigh the evidence, but instead must "determine whether there is a genuine issue for trial." *Id.* (internal quotation marks omitted).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.  ANALYSIS

The Complaint sets forth the following eight claims:

> Count I - Violation of the Fourth Amendment, 42 U.S.C. § 1983 Excessive Force;
> Count II - Assault and Battery;
> Count III - Violation of the Fourth Amendment, 42 U.S.C. § 1983 Illegal Search and Seizure;
> Count IV - False Arrest/False Imprisonment;
> Count V - Violation of the Fourth Amendment, 42 U.S.C. § 1983 Malicious Prosecution;
> Count VI - Malicious Prosecution;
> Count VII - Gross Negligence;
> Count VIII - Unadilla Township and Northfield Township's Constitutional Violations.

Defendants argue (1) that Plaintiff cannot establish his alleged constitutional violations because there was probable cause for his arrest, (2) that the search of Plaintiff's home was

9

reasonable, (3) that the record establishes there was no excessive force, and (4) that even if Plaintiff could establish constitutional violations, Defendants are entitled to qualified immunity.

## A. Probable Cause

### 1. Seizure

"[I]n order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009). In this case, Plaintiff must challenge the validity of the arrest warrant to prevail on his false arrest claim, "[b]ecause an arrest based on a facially valid warrant approved by a magistrate provides a complete defense[.]" *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010). Plaintiff must therefore show by a preponderance of the evidence "that in order to procure the warrant, [Defendants] knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that created a falsehood and such statements or omissions were material, or necessary, to the finding of probable cause." *Id.* (quotation and punctuation omitted).

Plaintiff argues that "there was no probable cause to arrest Plaintiff in the first place, because the only evidence that Defendants had was that prank calls were coming from a cell phone in Plaintiff's name." (Pl.'s Resp. to Defs.' Mot. for Summ. J. 10.) This argument misstates the record. The Police Report reflects that the evidence in support of the arrest warrant included not only Plaintiff's cell phone number, but also Mr. Glover's description of the caller's voice as having a southern accent or drawl. Defendant Kopacz also listened to the caller when he called Ms. Wehr and described the voice as having a southern accent. When Defendant Hamlin contacted Plaintiff by calling his cell phone, Defendant Kopacz also spoke with Plaintiff on the phone and identified Plaintiff's voice "as the same voice when [Defendant Kopacz] spoke with him on 4/14/09." (Police

10

Report 3.)  Plaintiff also admitted to Defendant Hamlin that he kept his phone on him at all times.

"Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Sykes*, 625 F.3d at 306 (citation omitted).  This standard "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n. 13 (1983).  Given the description of the harassing caller as having a southern accent, Defendant Kopacz's observation that Plaintiff's voice was the same voice he heard on April 14, 2009, when Ms. Wehr received a threatening call, and Plaintiff's statements that he kept his cell phone on him at all times, Defendants had reasonable grounds for belief that Plaintiff was making threatening calls to Mr. Glover and Ms. Wehr from his cell phone.

Furthermore, Plaintiff's argument fails to show that Defendants, particularly Defendant Hamlin, made any false statements or omissions that were material to the magistrate's finding of probable cause in issuing the warrant for Plaintiff's arrest.  Accordingly, the facially valid arrest warrant for Plaintiff provides a complete defense to Plaintiff's false arrest claim.  *See Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005) (finding that summary judgment for the defendants on false arrest claim was appropriate, and holding, "Because we have determined that Defendants had probable cause, their reliance on a warrant that accused Plaintiff of committing theft in office was justified.").

Plaintiff argues that even if probable cause existed to support the arrest warrant, probable cause dissipated once Plaintiff's son confessed to making the threatening phone calls.  Defendants argue that once an arrest warrant was issued for Plaintiff, they were obligated to carry out the warrant, and that failure to do so could make them liable for "tort-like damages."  *See In re Bradley Estate*, 296 Mich. App. 31, 39 (2012) (holding that "tort-like damages are recoverable in a contempt

11

action[,]" where police officers failed to obey a probate court order to take an individual into custody for a psychiatric evaluation and petitioner filed a petition alleging civil contempt against the officers with the probate court).

Regardless of whether Defendants' refusal to arrest Plaintiff would make them liable for damages in a possible civil contempt proceeding, probable cause did not vanish after Kevin Rains admitted that he made the threatening calls. Kevin Rains' admission did not alter or negate any of the facts establishing probable cause in the arrest warrant. It is also not unusual for a bystander to try and deflect police action during an arrest. Taking into account the totality of the circumstances after Kevin Rains' admission, "recognizing both the inculpatory *and* exculpatory evidence," *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000), it was not clear whether Plaintiff and his son participated together in the threatening phone calls, or whether Plaintiff made some calls and his son used the online "soundboard" to make other calls.

In sum, there was probable cause to arrest Plaintiff on June 12, 2009, and nothing that Kevin Rains said during the arrest dissipated this probable case. Defendants' are therefore entitled to summary judgment on Plaintiff's false arrest/false imprisonment claim.

*2. Malicious Prosecution*

A malicious prosecution claim requires Plaintiff to show: (1) that a criminal prosecution was initiated against Plaintiff; (2) "that there was a lack of probable cause for the criminal prosecution[;]" (3) that Plaintiff suffered a deprivation of liberty as a consequence of the legal proceeding; and (4) that the criminal proceeding resolved in Plaintiff's favor. *Sykes*, 624 F.3d at 308-09.

As noted *supra*, Plaintiff cannot establish a lack of probable cause. There was probable

12

cause to arrest Plaintiff based on the facially valid warrant for his arrest, and nothing said by Kevin Rains negated the probable cause established by the arrest warrant. Plaintiff's subsequent prosecution was therefore justified by probable cause. His claim for malicious prosecution thus fails. *See Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003) (holding that "Thacker's arrest and prosecution here were justified by probable cause. Because he cannot show the absence of probable cause, Thacker cannot demonstrate any seizure in violation of the Fourth Amendment. Thus, we need not attempt to enunciate the other elements of a malicious prosecution claim here.").

## B.  Reasonableness of Search

Plaintiff concedes that Defendants were permitted to conduct a "protective sweep" search of his home in connection with Plaintiff's arrest. Plaintiff argues, however, that Defendants exceeded the scope of the permissible search by taking an hour to search the home, overturning beds, throwing clothes on the ground, and opening drawers and cupboards.

A police officer, during a lawful arrest, may conduct a "protective sweep" of a home, and "without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of the arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). The Supreme Court has emphasized that "such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335. "The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Arizona v. Gant*, 556 U.S. 332, 338 (2009)

Defendants argue that the audio recordings establish that the search of Plaintiff's home was

brief and could not have exceeded the scope of a *Buie* protective sweep, because Defendant Flanary conducted the search and then assisted Defendant Kopacz with escorting Plaintiff to the police car just a few minutes later.  However, it is not clear based on the audio who, if anyone, assisted Defendant Kopacz when Plaintiff was placed into the police car.  Furthermore, Plaintiff testified that even after he was in the police car, Defendants continued searching his home.  Viewing the evidence in a light most favorable to the nonmoving party, based on this record the Court cannot conclude that Defendants' search took only a few brief minutes, as Defendants contend.

Nevertheless, the Court finds that the search of Plaintiff's home was reasonable.

Kevin Rains testified that Defendants opened up draws and cupboards in Plaintiff's kitchen, threw clothes from his closet on the ground, and overturned his bed while searching Plaintiff's home.

> Q.     You indicated that the officers searched the house.  Did they search your room?
> A.     Yes.
> Q.     What did they do to your room?
> A.     They -- they messed some stuff up in there.  They -- they -- there was stuff thrown in my room and my bed was flipped over and it was really messed up.  I had to straighten it up afterwards.
> Q.     Did they open up dresser drawers?
> A.     I didn't have a dresser.
> Q.     Okay.  Did they open up any drawers in your bedroom?
> A.     They -- I had like a closet door.  It was opened up and some of my clothes were thrown on the ground.
> Q.     Did they -- anywhere in the house did they -- did you ever see any indication that they opened up cupboards or any -- opened up drawers?
> A.     Yes.
> Q.     Where did you see that?
> A.     There was some in the kitchen that were open.  There was stuff --
> Q.     Drawers, cupboards, or what?
> A.     Drawers.  There was drawers, cupboards open, doors open

14

> where they were.  Flannery was going through the house and
> I guess whatever other officers while they were doing it.

(Kevin Rains Dep. 68-69.)

The Court notes that Plaintiff's home was a single story, with no basement or upper level, and was "[e]xceptionally small." (Flanary Dep. 20.)  Defendants were therefore permitted to check the closets in Kevin Rains' and Plaintiff's bedrooms, because they were "spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334.  The Sixth Circuit has also held that it is reasonable for police officers to search under a bed as part of a protective sweep to ensure that no one is hiding under it. *United States v. Bass*, 315 F.3d 561, 564 (6th Cir. 2002); *See also United States v. Lanier*, 285 Fed. Appx. 239, 242 (2008) (holding that a search under a mattress and box springs was reasonable as part of a protective sweep, even though the bed lacked a frame).

The search of the drawers and cupboards in Plaintiff's home was also reasonable.  At the time of the arrest and search, Defendants were aware that Plaintiff was a convicted felon with a criminal history of assault and battery. Defendants were also aware that Kevin Rains was in the house, and due to the size of the home, that Kevin Rains had immediate access to several rooms, including the kitchen.

Given these facts – that the home was very small, that Plaintiff was previously convicted of assault and battery, and that Kevin Rains was not handcuffed or otherwise detained by the officers and could easily access the kitchen – it was reasonable for Defendants to conduct a protective sweep of Plaintiff's home that included drawers and cupboards in the kitchen area, to ensure officer safety. Defendants could have reasonably believed that either Plaintiff or Kevin Rains had a weapon hidden in a closet, under a bed, or in a drawer or cupboard, and that weapon could pose a danger to officers.

*See Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (holding that a protective sweep of the area within a person's grab space is permissible, even if the person is not under arrest, if the police have reason to believe that person can have immediate access to a weapon); *see also Stricker v. Township of Cambridge*, 710 F.3d 350, 362 (2013) (holding that "protective sweep" search, which included search of kitchen drawers and cabinets, was reasonable due in part to the need to safeguard officers and EMS).

Accordingly, Defendants did not exceed the bounds of the Fourth Amendment when they searched Plaintiff's home.  Plaintiff's illegal search and seizure claim is therefore dismissed.

## C. Excessive Force

In determining whether police officers used excessive force, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  The United States Supreme Court has stated that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id.* (citation omitted).

The Court is guided in its analysis by three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013).  The Court examines these factors in the context of

16

"whether the totality of the circumstances justifies a particular sort of seizure." *Id*. With regard to excessive force involving handcuffs, the Sixth Circuit has provided that "a plaintiff must create a genuine issue of material fact that: (1) he or she complained that the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some physical injury resulting from the handcuffing." *Stricker*, 710 F.3d at 364 (citation omitted).

Plaintiff claims that Defendant Kopacz used excessive force when he "jammed" Plaintiff's leg into the police car. Plaintiff also claims that Defendant Kopacz refused to loosen his handcuffs after he complained that they were too tight.

Defendants argue that they are entitled to summary judgment on Plaintiff's excessive force claim because Plaintiff's testimony that he complained about the tightness of the handcuffs, and that he was injured when Defendant Kopacz "jammed" his leg into the police car, are blatantly contradicted by the audio recordings. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The Sixth Circuit has applied the *Scott* analysis to cases involving audio recordings. *Coble v. City of White House, Tenn.*, 634 F.3d 865, 869 (6th Cir. 2011). However, the Sixth Circuit has cautioned that the lack of corroborating sound on an audio recording does not necessarily "blatantly contradict" the testimony of a party. *Id*. at 869-70.

In *Coble*, the Sixth Circuit found that it was error to grant summary judgment in favor of the defendant police officer where the plaintiff, who had suffered an open fracture on his ankle when the defendant officer performed a take-down maneuver, testified "that he screamed" and "called [the

defendant officer] names" when the officer was walking the plaintiff to the police car.  *Id*. at 869.

The Sixth Circuit reasoned as follows:

> The lack of sound on an audio recording cannot be reliably used to
> discount Coble's testimony.  Many factors could affect what sounds
> are recorded, including the volume of the sound, the nature of the
> activity at issue, the location of the microphone, whether the
> microphone was covered. . . . Coble testified that he screamed, that
> he called Officer Carney names, that he was forced to walk on his
> broken ankle, and that he was dropped face-first on the ground.  His
> testimony is not "blatantly contradicted" by the lack of corroborating
> sound on the audio recording.  A reasonable jury could believe
> Coble's version of the events.

*Id*. at 869-70.

Unlike *Coble*, the audio recording in this case does blatantly contradict Plaintiff's deposition

testimony.  In this case, Defendants do not rely solely on silence or a lack of corroborating sound

on the audio recordings in arguing summary judgment, but instead rely on Plaintiff's contradictory

statements on the recordings.

Plaintiff's testimony that he complained about the tightness of the handcuffs twice –

immediately after Defendant Kopacz placed the handcuffs on Plaintiff and again when Defendant

Kopacz was leading Plaintiff to the car – is contradicted by Plaintiff's own statements on the audio

recordings.  On the Powell recording, Defendant Kopacz asks Plaintiff to put his hand behind his

back and put his palms together prior to placing the handcuffs on Plaintiff.  (Powell Recording

05:13, 05:20.)  Plaintiff responds, "Oh" or "Okay."  (Powell Recording 05:21.)  Plaintiff is then

asked if he has anything on him that he does not want to take to jail, and Plaintiff responds, "No, but

what am I going to jail for?" (Powell Recording 05:30.)  While Plaintiff's voice can be heard on the

recording, he never complains about the tightness of the handcuffs.

On Defendant Kopacz's recording, Plaintiff's voice can be heard when Defendant Kopacz

begins walking him to the car. Defendant Kopacz can be heard telling Plaintiff to watch his step on the way to the car and to "go back to that car, right there." (Kopacz Recording 02:57.) Defendant Kopacz can then be heard opening a car door and telling Plaintiff to "have a seat." (Kopacz Recording 03:10.) Plaintiff cannot be heard complaining about the tightness of the handcuffs, nor can Defendant Kopacz be heard saying "I'll get with you in a minute" in response to Plaintiff's complaint, as Plaintiff testified. (Pl. Dep. 35.)

After Defendant Kopacz tells Plaintiff to "have a seat," Plaintiff tells Kopacz "I got a bad leg here," and Defendant Kopacz replies, "Just do the best you can with it." (Kopacz Recording 03:34-03:38.) A few seconds later, Defendant Kopacz asks Plaintiff, "You got it?" and Plaintiff responds, "Yeah, I'm okay." (*Id.* at 03:43.) At no point is Plaintiff heard exclaiming "man, that hurts," as he testified at his deposition. Plaintiff's deposition testimony is blatantly contradicted by his statement on the audio recording that he was "okay" after getting in the police car.

Like the videotape in *Scott*, the audio recordings in this case blatantly contradict Plaintiff's deposition testimony. Both the Powell recording and the Kopacz recording are continuous, and Plaintiff's voice, which is clearly distinguishable from the other voices, is audible throughout both recordings. Although Plaintiff points out that the officers were able to switch the audio off and on, there is no stoppage on either of the audio recordings throughout Plaintiff's arrest. In addition, "[t]here are no allegations or indications that [the audio recordings were] doctored or altered in any way, nor any contention that what [they] depect[] differs from what actually happened." *Scott*, 550 U.S. at 378.

Viewing the record as a whole, the Court finds that Plaintiff's claims are so "blatantly contradicted by the record, . . . that no reasonable jury could believe [them.]" *Scott*, 550 U.S. at 380.

In light of this record, a reasonable juror could not believe that Plaintiff complained twice that his handcuffs were too tight, at the times stated in Plaintiff's deposition testimony. Also, a reasonable juror could not believe Plaintiff's claims that Defendant Kopacz "jammed" his leg into the car, causing Plaintiff to say "man, that hurts." Defendants are therefore entitled to summary judgment on Plaintiff's excessive force claims.[3]

## D.  Municipal Liability

Plaintiff alleges that Defendants Northfield and Unadilla are liable for failure to adequately train and supervise their employees. "[T]he applicable standard for municipal liability is deliberate indifference." *Fox v. DeSoto*, 489 F.3d 227, 238 (6th Cir. 2007). Before the issue of deliberate indifference can be reached, however, "the plaintiff must demonstrate a constitutional violation at the hands of an agent or employee of the municipality." *Id*.

As noted *supra*, Plaintiff has failed to establish constitutional violations against any of the individual Defendants. Accordingly, the municipal Defendants are entitled to summary judgment.

## E. State Law Claims

Under Michigan law, "a claim of false arrest or false imprisonment cannot be sustained if the arrest was legal." *Odom v. Wayne County*, 482 Mich. 459, 481 (2008). Likewise, "the plaintiff's burden in a malicious prosecution case is to make a prima facie showing that the defendant's agents lacked probable cause to believe that the plaintiff had committed a crime." *Matthews v. Blue Cross and Blue Shield of Michigan*, 456 Mich. 365, 379 (1998). As noted *supra*, Plaintiff cannot establish that Defendants lacked probable cause to arrest him. Defendants are thus entitled to summary

---

[3]Because Plaintiff cannot establish a genuine issue of material fact on his excessive force claims, the Court will decline to address Defendants' argument that they are entitled to qualified immunity on these claims.

judgment on Plaintiff's state law claims for false arrest/false imprisonment, and malicious prosecution.

Michigan Courts have adopted the reasoning of the Sixth Circuit in determining whether a police officer's conduct of handcuffing an arrestee too tightly amounts to gross negligence. *Oliver v. Smith*, 269 Mich. App. 560, 566 (2006). Defendants are thus entitled to summary judgment on Plaintiff's gross negligence claim for the reasons stated *supra* at Part III. C.

An arresting officer under Michigan law "may use reasonable force when making an arrest." *Brewer v. Perrin*, 132 Mich. App. 520, 528 (1984). Reasonable force means force that "an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary." *Id.*

As discussed *supra* at Part III. C., Defendant Kopacz did not use excessive or unreasonable force when helping Defendant into the patrol car. Regarding assault and battery, the "question is whether defendant acted in good faith when he selected how tightly to handcuff plaintiff . . . ." *Oliver v. Smith*, 290 Mich. App. 678, 688 (2010). Plaintiff's evidence showing that Defendant Kopacz did not use good faith when he selected how tightly to handcuff Plaintiff is blatantly contradicted by the audio recordings in this case, and thus fails to create a genuine issue of material fact.

## IV. CONCLUSION

For the reasons stated above, the Court will:

(1) **GRANT** Defendants Unadilla Township, Ryan Hamlin, Garry Flanary, K. Kopacz, Northfield Township, and David Powell's Motion for Summary Judgment; and

(2) **DISMISS** the action **WITH PREJUDICE**.

**IT IS SO ORDERED.**


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 26, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 26, 2013.


s/Deborah Tofil
Case Manager

22